1

2

3

4

5

6                    UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF WASHINGTON
7                              AT SEATTLE

8    ISMAIL HASSAN,

9                        Petitioner,              Case No. C18-67-JCC-JPD

10        v.

                                                  REPORT AND RECOMMENDATION
11   MIKE OBENLAND,

12                       Respondent.

13

14              INTRODUCTION AND SUMMARY CONCLUSION

15        Petitioner Ismail Hassan is a state prisoner who is currently confined at the Washington

16   State Reformatory in Monroe, Washington.  He seeks relief under 28 U.S.C. § 2254 from a 2009

17   King County Superior Court judgment and sentence.  Respondent has filed an answer to

18   petitioner's petition together with relevant portions of the state court record.  This Court, having

19   reviewed petitioner's petition, the briefing of the parties, and the state court record, concludes

20   that the petition should be denied and this action should be dismissed with prejudice.

21                       FACTUAL/PROCEDURAL HISTORY

22        The Washington Court of Appeals, on direct appeal, summarized the facts of petitioner's

23   crime, and the relevant testimony presented at trial, as follows:

REPORT AND RECOMMENDATION
PAGE - 1

On the evening of August 30, 2008, Yudith Fuentes Carrazco celebrated her 26th birthday with her boyfriend, Fidel Juarez Castillio.  Later that evening, Yudith and Fidel went to celebrate with Yudith's sister, Benecia Carrazco and her boyfriend Ismail Hassan at their apartment in the Cove Apartments complex.  Hassan was not there, but he arrived a short time later accompanied by two men.  Hassan identified the two men as "cousins."[1]  Hassan was wearing a yellow polo shirt that night.[2]  Soon thereafter, a number of Yudith's and Fidel's friends arrived.  The group included Fidel's two brothers, Oscar and Luis, and friends, Mari Carmen Vasquez, Martha Mercado, and Eduardo Nicio.

He greeted the guests and offered them drinks.[3]  Shortly after Fidel's brothers and friends arrived, Hassan's friend Brian Williams, his wife, and Yudith's sister Benecia, left the apartment to take someone home.  Awhile later, Hassan told Yudith, Fidel, and their friends that they were being too loud.  The group decided to leave.  However, before they could do so, Fidel and Hassan got into a fight.  Yudith called 911.

Fidel's brothers intervened to pull Fidel and Hassan apart, saying "stop, we're leaving . . . don't make this thing any bigger."  One of Hassan's cousins grabbed the knife that was used to cut the birthday cake and threatened Fidel with it.  While the others were leaving, some of them heard Hassan say "bring the guns, bring the nine."  As they were running down the stairs to the parking lot, someone threw a beer bottle and hit one of them on the head.

Luis, Fidel, Yudith, and Mari Carmen got into Luis's truck.  Martha Mercado and Oscar got into Mercado's car.  As the two vehicles drove past Hassan's apartment, they saw Hassan standing with a shotgun.  Hassan was aiming the shotgun at the two vehicles.[4]  Most of the passengers also testified that one of the cousins was standing next to Hassan holding a handgun and the other

---

[1] [Court of Appeals footnote]  Hassan and his two cousins were described by witnesses as "African" or "African-American."  The witnesses at the party said both cousins were shorter that Hassan, and one wore a white shirt.

[2] [Court of Appeals footnote]  Most of the witnesses said Hassan's shirt was yellow, but some described it as orange.

[3] [Court of Appeals footnote]  Yudith had met Hassan "many times" because of his involvement for a year and a half with her sister.  She had also met his cousins before.  The three brothers, Fidel, Luis, and Oscar, had also met or seen Hassan before.

[4] [Court of Appeals footnote]  Mercado said she had just seen Hassan, so she "recognized his face" and he was still wearing the yellow shirt.  Luis and Oscar also testified they recognized Hassan's face.  Mari Carmen said the shooter was wearing the same yellow shirt, and she also recognized him as being the same person from the party.  Fidel said "I saw him in the eyes, it was Ismail."

REPORT AND RECOMMENDATION
PAGE - 2

cousin was walking toward Hassan. Hassan fired at least three, and possibly four, shots at the two vehicles.[5]

Eduardo Nicio testified that as his friends and Hassan were leaving the apartment, Hassan's cousins grabbed him, pulled him back into the apartment, and punched him for several minutes. Nicio said he was only able to get away after he heard shots. Nicio testified that as he ran down the stairs, he encountered Hassan at the bottom of the stairs. Nicio said that Hassan hit him in the face, and then continued up the stairs. Nicio ran to the entrance of the complex where the police had stopped Luis's truck and Mercado's car.

Monique Castain, a resident of the complex, testified that at about 4:15 a.m. she heard sounds of fighting outside. Less than five minutes later, Castain looked out the window and saw a black male wearing an "orange shirt" at the stairway to the parking lot holding a shotgun. She said that he was joined by another, shorter black man holding a knife, and the two walked over to the garage area of the parking lot, then disappeared from view. Castain called 911. While Castain was on the phone with 911, she heard gunshots.

Another resident, Melody Bruscas, heard the sound of fighting. She saw two men open the garage door of the building across the street, open the trunk of the car, and take out a "large gun." Bruscas said the man carrying the gun was black, was wearing a yellow shirt, and was taller than the other man. Bruscas said that after the two men walked around the corner, she heard gunshots and called 911.

Federal Way Officer Raymond Bunk arrived at the apartment complex in response to a report of a fight with a weapon. After Officer Bunk blocked the entrance to the complex with his police car, he heard the sounds of gunshots. Immediately thereafter, Officer Bunk saw a truck and a car approaching at high speed and stopped both vehicles.

When backup arrived a few minutes later, the police officers placed each of the occupants of the vehicles in separate patrol cars to question them. Each of the occupants described the shooter, one of them said his name was "Ismail."

The police officers searched the parking lot and recovered two spent twelve gauge shotgun shells. Hassan approached the officers and identified himself by name. Hassan matched the description of the shooter. Hassan was

---

[5] [Court of Appeals footnote] The truck rear window was shattered, but the car Mercado was driving sustained only minor damage and none of the passengers sustained significant injury.

REPORT AND RECOMMENDATION
PAGE - 3

dressed in pajama bottoms and a tank top.  Hassan said he was in his apartment when he heard shots, and came out to investigate.[6]

After the police arrested Hassan and advised him of his <u>Miranda</u> rights, they asked Hassan where the gun was located.  Hassan said he had been home alone, and did not have a gun.  Hassan told the officers there had been a number of people at his apartment earlier that evening, that they had been loud and drunk, and he "kicked them out."  When asked about the two men who had been with him earlier, Hassan did not identify them by name, but said his "cousins had left."  Hassan gave the police officers consent to search his apartment and his car.

The police found a yellow polo shirt with orange and brown writing on the front in Hassan's bedroom.  They also found a case for a 9 mm handgun and a handgun holster elsewhere in the apartment.  In the trunk of his car, the officers found an empty box of shotgun ammunition.[7]  The police never located the shotgun.

Each of the occupants of the vehicles identified Hassan as the shooter and identified the shirt found in his apartment as the one Hassan had been wearing earlier in the evening.

The State charged Hassan with two counts of assault in the first degree.  In count I, the State alleged assault in the first degree with a firearm of Mari Carmen, Yudith, Luis and Fidel.  In count II, the State alleged assault in the first degree with a firearm of Martha Mercado and Oscar.  Shortly before trial, the court granted the State's motion to amend the information to add a firearm enhancement for each count.

During the approximately two-week long trial, the occupants of the two vehicles, two residents of the apartment complex who called 911, and several police officers testified on behalf of the State.  Each of the victims identified Hassan as the person who fired the shotgun.

Hassan's defense was general denial.  The defense theory was that the victims had misidentified Hassan as the shooter.  Hassan presented the testimony of two expert witnesses, psychologist Dr. Geoffrey Loftus, and firearms expert Kay Sweeney.  Dr. Loftus testified about memory and factors that affect eyewitness identification.  Sweeney testified that the shotgun shells and handgun box could have been tested for latent fingerprints, and that he would expect to find the presence of gunshot residue on the person or clothing of someone who

---

[6] [Court of Appeals footnote]  Hassan told the officer he lived in apartment 111, although his apartment was No. 108.

[7] [Court of Appeals footnote]  The ammunition box was the same brand, but not the same type of ammunition recovered in the parking lot.

REPORT AND RECOMMENDATION
PAGE - 4

fired a shotgun for up to four hours after the shooting. But Sweeney admitted that the damage to the vehicles was caused by a twelve gauge shotgun.

The defense also presented the testimony of two other residents of the complex. Neither of the residents witnessed the shooting. Mike Ochoa testified that he saw Hassan shortly after hearing gunshots. The other resident, Brian Williams, had been at Hassan's apartment earlier in the evening, but left before the fight broke out. Williams said that while he was walking around the apartment complex trying to find out why the police were there, he saw Hassan's cousins and told them to go to his apartment. Williams testified that Hassan's cousins stayed at his apartment until the middle of the following day when Williams dropped them off at a shopping mall.

Before closing arguments, the State moved to amend the information to correct the names of the victims identified in count I. The defense did not object. The court granted the motion to amend. The second amended information substituted "Yudith Fuentes Carrazco" for "Yudith Fuentes," "Mari Carmen Vasquez" for "Mari Carmen Vasquez Calderon," and deleted a hyphen in Fidel's surname, Juarez Castillio. However, unbeknownst to the court and the parties, the second amended information also changed the charge in count II from assault in the first degree to assault in the second degree.

The parties only proposed instructions for the crime of assault in the first degree. Hassan's proposed instructions included a definition of "great bodily harm," a necessary element of assault in the first degree, and proposed a verdict form and special verdict forms identifying the charges in both count I and count II as assault in the first degree. The "[t]o convict" instructions for each count stated that in order to find Hassan guilty of the crime of assault in the first degree, the jury had to find that he committed assault "with a firearm or with a deadly weapon or by a force or means likely to produce great bodily harm."

During closing argument, both the State and the defense emphasized that in order to convict Hassan, the jury had to find beyond a reasonable doubt that Hassan had committed assault in the first degree. The jury returned verdicts for each count finding Hassan guilty of "the crime [of] Assault in the First Degree" and in the special verdict forms found that Hassan was armed with a firearm for each count.

Hassan filed a motion for a new trial, arguing that the evidence did not establish intent to inflict great bodily harm with respect to count II. Hassan asserted that because the shooter fired at close range and failed to damage Martha Mercado's vehicle, the evidence did not support his conviction for assault in the first degree. The trial court denied the motion.

REPORT AND RECOMMENDATION
PAGE - 5

1

2   Before sentencing, the court notified the parties that the second amended
    information had changed the charge in count II from assault in the first degree to
3   assault in the second degree.  At the outset of the sentencing hearing, the State
    informed the court that the alteration of the charge in count II in the second
4   amended information was an unintentional clerical error.  The State moved to
    amend the information to accurately reflect the charge of assault in the first
5   degree.[8]  Hassan's attorney conceded that it was "clear" that the purpose of the
    second amended information was to correct the victims' names.  But the attorney
6   argued that even though "the Jury found Mr. Hassan guilty of first degree
    assault," because the information was inadvertently amended to change the charge
7   to assault in the second degree in count II, the court should deny the motion to
    amend and to enter a verdict on assault in the second degree for count II.  The
8   court granted the State's motion to amend and file a third amended information
    correcting the clerical error.

9   The court imposed a standard range sentence.

10  (Dkt. 17, Ex. 2 at 1-9.)

11      Petitioner appealed his judgment and sentence to the Washington Court of Appeals, and

12  the Court of Appeals issued an unpublished opinion affirming petitioner's convictions on

13  November 8, 2010.  (*See id.*, Exs. 2-5.)  Petitioner thereafter filed a petition for review in the

14  Washington Supreme Court, and the Supreme Court denied review without comment on March

15  2, 2011.  (*See id.*, Exs. 6-7.)  The Court of Appeals issued its mandate terminating direct review

16  on May 4, 2011.  (*Id.*, Ex. 8.)

17      On March 27, 2012, petitioner, through counsel, filed a personal restraint petition in the

18  Washington Court of Appeals.  (*See id.*, Exs. 9-13.)  The Court of Appeals issued an unpublished

19  opinion denying the petition on March 21, 2016.  (*Id.*, Ex. 14.)  Petitioner next filed a motion for

20  discretionary review in the Washington Supreme Court.  (*Id.* at 15.)  The Supreme Court

21

22      [8] [Court of Appeals footnote]  The prosecutor explained the reason for the error was that during the plea
    negotiations, the State proposed that Hassan plead guilty to second degree assault on count II and drafted an
23  amended information to that effect.  That information was the last version on the computer and the alteration of
    count II was therefore erroneously incorporated into the second amended information.

REPORT AND RECOMMENDATION
PAGE - 6

Commissioner issued a ruling denying review on September 25, 2017.  (Dkt. 17, Ex. 16.)

Petitioner moved to modify the Commissioner's ruling, and that motion was denied on January

3, 2018.  (*Id*., Exs. 17-18.)  The Washington Court of Appeals issued a mandate terminating

review on February 2, 2018.  (*Id*., Ex. 19.)  Petitioner now seeks federal habeas review of his

conviction.

GROUND FOR RELIEF

Petitioner identifies a single ground for relief in his federal habeas petition:

TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OFFER A
LESSER INCLUDED INSTRUCTION OF ASSAULT IN THE SECOND
DEGREE ON COUNT II.

(Dkt. 1 at 8.)

DISCUSSION

Respondent concedes that petitioner properly exhausted his claim in the state courts.

(Dkt. 15 at 7.)  Respondent argues, however, that the state courts reasonably denied the claim in

petitioner's personal restraint proceedings.  (*See id*. at 11-16.)

Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a habeas corpus

petition may be granted with respect to any claim adjudicated on the merits in state court only if

the state court's decision was contrary to, or involved an unreasonable application of, clearly

established federal law, as determined by the Supreme Court, or if the decision was based on an

unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).

Under the "contrary to" clause, a federal habeas court may grant the writ only if the state

court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law,

or if the state court decides a case differently than the Supreme Court has on a set of materially

REPORT AND RECOMMENDATION
PAGE - 7

1   indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  Under the

2   "unreasonable application" clause, a federal habeas court may grant the writ only if the state

3   court identifies the correct governing legal principle from the Supreme Court's decisions, but

4   unreasonably applies that principle to the facts of the prisoner's case. *See Williams*, 529 U.S. at

5   407-09.

6           The Supreme Court has made clear that a state court's decision may be overturned only if

7   the application is "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 69 (2003).  The

8   Supreme Court has further explained that "[a] state court's determination that a claim lacks merit

9   precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness

10  of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 88 (2011) (citing *Yarborough*

11  *v. Alvarado*, 541 U.S. 652, 664 (2004)).

12          Clearly established federal law, for purposes of AEDPA, means "the governing legal

13  principle or principles set forth by the Supreme Court at the time the state court render[ed] its

14  decision." *Lockyer*, 538 U.S. at 71-72.  "If no Supreme Court precedent creates clearly

15  established federal law relating to the legal issue the habeas petitioner raised in state court, the

16  state court's decision cannot be contrary to or an unreasonable application of clearly established

17  federal law." *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004) (citing *Dows v. Wood*, 211 F.3d

18  480, 485-86 (9th Cir. 2000)).

19          In considering a habeas petition, this Court's review "is limited to the record that was

20  before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S.

21  170, 181-82 (2011).  If a habeas petitioner challenges the determination of a factual issue by a

22  state court, such determination shall be presumed correct, and the applicant has the burden of

23

REPORT AND RECOMMENDATION
PAGE - 8

1  rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C.

2  § 2254(e)(1).

3  <u>Ineffective Assistance of Counsel</u>

4      Petitioner asserts that he was denied effective assistance of counsel when trial counsel

5  failed to request a jury instruction on the lesser included offense of second degree assault with

6  respect to one of the two charged counts of first degree assault.  (Dkt. 1.)

7      The Sixth Amendment guarantees a criminal defendant the right to effective assistance of

8  counsel.  *Strickland v. Washington*, 466 U.S. 668 (1984).  "The essence of an ineffective-

9  assistance claim is that counsel's unprofessional errors so upset the adversarial balance between

10  defense and prosecution that the trial was rendered unfair and the verdict rendered suspect."

11  *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986).  Claims of ineffective assistance of counsel

12  are evaluated under the two-prong test set forth in *Strickland*.  Under *Strickland*, a defendant

13  must prove (1) that counsel's performance was deficient and, (2) that the deficient performance

14  prejudiced the defense.  *Strickland*, 466 U.S. at 687.

15      With respect to the first prong of the *Strickland* test, a petitioner must show that counsel's

16  performance fell below an objective standard of reasonableness.  *Id.* at 688.  Judicial scrutiny of

17  counsel's performance must be highly deferential.  *Id.* at 689.  "A fair assessment of attorney

18  performance requires that every effort be made to eliminate the distorting effects of hindsight, to

19  reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from

20  counsel's perspective at the time."  *Id.*  In order to prevail on an ineffective assistance of counsel

21  claim, a petitioner must overcome the presumption that counsel's challenged actions might be

22  considered sound trial strategy.  *Id.*

23

REPORT AND RECOMMENDATION
PAGE - 9

The second prong of the *Strickland* test requires a showing of actual prejudice related to counsel's performance. In order to establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The reviewing court need not address both components of the inquiry if an insufficient showing is made on one component. *Id*. at 697.

While the Supreme Court established in *Strickland* the legal principles that govern claims of ineffective assistance of counsel, it is not the role of the federal habeas court to evaluate whether defense counsel's performance fell below the *Strickland* standard. *Harrington*, 562 U.S. 101. Rather, when considering an ineffective assistance of counsel claim on federal habeas review, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Id*. As the Supreme Court explained in *Harrington*, "[a] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id*.

The Washington Court of Appeals rejected petitioner's ineffective assistance of counsel claim in his personal restraint proceedings. The Court of Appeals explained its conclusion as follows:

> Hassan argues that his counsel was ineffective for failing to request a jury instruction for the lesser included offense of assault in the second degree. PRP at 20. He contends that defense counsel never told him he could request such an instruction and that even though he maintained his innocence on both charges, he "still would only want to be convicted of the lesser charge rather than the greater charge." PRP at Appendix (Declaration of Ismail Hassan at ¶ 8).
>
> In his declaration, trial counsel states that he "sought jury instructions that were an accurate statement of the law and which were helpful to Mr. Hassan's defense" and that he "[did] not recall what, if any, discussions" he had with Hassan "regarding the trial strategy and client controlled objectives as it pertained

REPORT AND RECOMMENDATION
PAGE - 10

to requesting lesser included Assault in the Second Degree instructions." PRP at Appendix (Declaration of Peter Geisness at ¶ 14). Hassan acknowledges that he turned down a plea offer of assault in the second degree on count two of the charged offenses. But he asserts that he would have requested an instruction on the lesser offense if his counsel had discussed the matter with him. PRP at Appendix (Declaration of Ismail Hassan at ¶ 8; PRP at 20).

Under the test announced in <u>State v. Workman</u>, 90 Wn.2d 443, 584 P.2d 382 (1978), a "defendant is entitled to an instruction on a lesser included offense if (1) each element of the lesser offense is necessarily included in the charged offense; and (2) the evidence in the case supports an inference that the defendant committed only the lesser crime." <u>State v. Gamble</u>, 137 Wn. App. 892, 905, 155 P.3d 962 (2007). Our Supreme Court has held that "the decision to exclude or include lesser included offense instructions is a decision that requires input from both the defendant and her counsel but ultimately rests with defense counsel." <u>State v. Grier</u>, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011).

"The decision to not request an instruction on a lesser included offense is not ineffective assistance of counsel if it can be characterized as part of a legitimate trial strategy to obtain an acquittal." <u>State v. Hassan</u>,[9] 151 Wn. App. 209, 218, 211 P.3d 441 (2009). "'The relevant question is not whether counsel's choices were strategic, but whether they were reasonable.'" <u>Grier</u>, 171 Wn.2d at 34 (quoting <u>Roe v. Flores-Ortega</u>, 528 U.S. 470, 481, 120 S. Ct. 1029, 145 L. Ed. 2d 985 (2000)). In <u>King</u>, this court held that counsel was not deficient for failing to request a lesser included instruction on simple assault because "[i]t was an all-or-nothing tactic that well could have resulted in an outright acquittal." <u>King</u>, 24 Wn. App. at 501. "Where a lesser included offense instruction would weaken the defendant's claim of innocence, the failure to request a lesser included offense instruction is a reasonable strategy." <u>Hassan</u>, 151 Wn. App. At 220.

Even assuming that evidence supported an instruction on a lesser offense and the trial court would have given it if requested, we do not conclude that trial counsel's failure to request it was below the standard of reasonableness. Hassan's defense was general denial. The defense theory was that the victims had misidentified Hassan as the shooter. It was not unreasonable for counsel to conclude that requesting an instruction for a lesser included offense would have undermined Hassan's claim of innocence. <u>See State v. Mullins</u>, 158 Wn. App. 360, 371-73, 241 P.3d 456 (2010) ("Plainly, Mullins made a conscious choice to pursue acquittal outright rather than conviction on the lesser offense."). Hassan does not establish ineffective assistance of counsel.

(Dkt. 17, Ex. 14 at 14-16.)

---

[9] [Court of Appeals footnote] This case involved a different defendant, whose name was also Hassan.

REPORT AND RECOMMENDATION
PAGE - 11

The Washington Supreme Court Commissioner likewise rejected petitioner's ineffective

assistance of counsel claim in ruling on petitioner's motion for discretionary review:

> Mr. Hassan also seeks review of the Court of Appeals hold [sic] that trial counsel was not ineffective in failing to request a lesser degree offense instruction on second degree assault. To succeed on this claim, Mr. Hassan must show both deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Scrutiny of counsel's conduct is highly deferential, and courts will indulge in a strong presumption of reasonableness. *State v. Garrett*, 124 Wn.2d 504, 518-19, 881 P.2d 185 (1994). Deficient performance is not shown by matters that go to trial strategy or tactics. *State v. Hendrickson*, 129 Wn.2d 61, 77-78, 917 P.2d 563 (1996). To show prejudice, Mr. Hassan must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *State v. Thomas*, 109 Wn.2d 222, 226, 743 P.2d 816 (1987). If Mr. Hassan fails to establish either element of his ineffective assistance claim, this court need not address the other element. *Hendrickson*, 129 Wn.2d at 78.

> Mr. Hassan included with his personal restraint petition a declaration from trial counsel stating that counsel sought jury instructions that were helpful to the defense and did not recall any conversation about trial strategy with regard to lesser degree offense instructions. Mr. Hassan asserts that he would have requested such an instruction had one been suggested by counsel. A defendant is entitled to an instruction on a lesser degree offense when he can show that the lesser offense is a lesser degree of the charged offense and the evidence supports an inference that the defendant committed only the lesser crime. *State v. Fernandez-Medina*, 141 Wn.2d 448, 454. 6 P.3d 1150 (2000). At issue here is whether the evidence supported a claim of only second degree assault or whether counsel had a separate strategic reason for not requesting the instruction. As relevant here, first degree assault requires evidence that the defendant assaulted another with a firearm by any force likely to produce great bodily harm or death and with the intent to inflict great bodily harm. RCW 9A.36.011. Second degree assault requires evidence that the defendant assaulted another with a deadly weapon; there is no need to prove intent to cause great bodily harm. RCW 9A.36.021.

> The State presented evidence that friends had gathered at Mr. Hassan's apartment to celebrate his girlfriend's sister's birthday. A disagreement arose, and Mr. Hassan told the guests they were being too loud. Mr. Hassan got into a fight with one of the guests, but others separated them, and the guests left. As they were leaving, Mr. Hassan said "bring the guns, bring the nine." *State v. Hassan*, No. 63556-5-I, 2010 WL 4409691, at 1 (Wash. App. Nov. 8, 2010) (unpublished). As the former guests got into two vehicles and left, witnesses saw

REPORT AND RECOMMENDATION
PAGE - 12

Mr. Hassan and one of his cousins pointing guns at them. Mr. Hassan aimed a shotgun at them and fired three or four shots at the two vehicles.

Mr. Hassan points to the testimony of one witness who saw Mr. Hassan point a gun at a truck as it drove by and ducked, heard a boom, and felt glass falling on her back. She heard only one shot. Mr. Hassan argues that a jury could reasonably have found that Mr. Hassan never shot at the second vehicle and could have had reasonable doubt about the intent of any additional shots.

Mr. Hassan may be correct that trial counsel could have received an instruction on second degree assault under these circumstances had one been requested. And although Mr. Hassan's trial strategy was to completely deny that he had participated and that the witnesses had misidentified him as the shooter, perhaps counsel could have argued that Mr. Hassan was "at most" guilty of second degree assault. But such arguments risk undermining the primary "all or nothing" strategy of seeking acquittal. When it comes to the decision whether to pursue lesser offense instructions, Mr. Hassan must show that there was no conceivable legitimate tactical reason for counsel's approach. *State v. Grier*, 171 Wn.2d 17, 42, 246 P.3d 1260 (2011). He fails to make this showing. Nor does he show in any event that had a lesser degree instruction been requested and given, there is a reasonable probability that the jury would have found him guilty of second degree assault rather than first degree assault. Mr. Hassan said, presumably to his cousin, to get the guns. He leveled the guns at the trucks, and he fired multiple shots at them. The jury obviously believed the State's evidence in finding that Mr. Hassan was the shooter, and having done so, it is unlikely it would have found that Mr. Hassan lacked intent to inflict great bodily harm.

(Dkt. 17, Ex. 16 at 3-6.)

Petitioner argues that the state court unreasonably determined that his trial counsel was not deficient, averring that there is no evidence in the state court record to support the conclusion that counsel decided to pursue an "all or nothing" strategy. (Dkt. 1 at 10.) It is true that nothing in the record conclusively establishes counsel's strategy surrounding the jury instructions. Petitioner's trial counsel, in a declaration submitted in support of petitioner's personal restraint petition, is somewhat vague as to his decisions regarding jury instructions, noting only that he sought jury instructions which "were an accurate statement of the law and which were helpful to [petitioner's] defense," and that he did not request a lesser included instruction of assault in the

REPORT AND RECOMMENDATION
PAGE - 13

second degree.  (Dkt. 17, Ex. 9, Decl. of Peter Geisness, ¶ 14.)  However, one could reasonably infer from this representation that counsel did not believe a lesser included offense instruction would have been helpful to petitioner's defense.

Moreover, it is noteworthy that during closing argument, defense counsel began his argument with a discussion of the second count of assault in the first degree, the one which petitioner claims warranted a lesser included offense instruction.  Counsel argued that the state had not proved the charge beyond a reasonable doubt because there was a lack of evidence that the shooting of the second vehicle was undertaken with the intent to inflict great bodily harm.  (*See* Dkt. 17, Ex. 31, April 29, 2009 at 22-25.)  Counsel deftly made this argument without ceding any ground on the defense theory that petitioner was not the shooter.  The manner in which counsel delivered his closing argument regarding the second count, and the fact that counsel actually renewed this argument in a post-trial motion for a new trial (*see id*., Ex. 31, May 22, 2009 at 8), strongly suggests that counsel intended to pursue an "all or nothing" strategy with respect to the second count of assault.  The fact that the strategy was ultimately unsuccessful is irrelevant.  This Court is satisfied that there was a legitimate tactical reason for defense counsel's decision not to request a lesser included offense instruction, just as the Washington Supreme Court concluded in petitioner's personal restraint proceedings.

Even assuming the failure to request the lesser included offense instruction could be deemed deficient performance, the Washington Supreme Court reasonably concluded that petitioner had not shown prejudice.  Petitioner argues that the state court's prejudice analysis was unreasonable in light of *Crace v. Herzog*, 798 F.3d 840 (9th Cir. 2015).  In *Crace*, the Ninth Circuit rejected the Washington Supreme Court's pronouncement that no prejudice could result from a defense attorney's failure to request a lesser-included-offense instruction as long as there

REPORT AND RECOMMENDATION
PAGE - 14

was sufficient evidence to support the verdict. *See id*. at 849.  The Ninth Circuit reasoned that

the state court's decision "in essence converted Strickland's prejudice inquiry into a sufficiency-

of-the-evidence question–an entirely different inquiry separately prescribed by *Jackson v.*

*Virginia*, 443 U.S. 307, 324 . . . ." *Id.*  The Ninth Circuit explained that in cases involving

ineffective assistance of counsel claims based on the failure to request a lesser-included-offense

instruction, *Strickland* "*requires* a reviewing court to assess the likelihood that the defendant's

jury would have convicted only on the lesser included offense." *Crace*, 798 F.3d at 849 (citing

*Keeble v. United States*, 412 U.S. 205, 213).

        The Washington Supreme Court's analysis in petitioner's case does not run afoul of

*Crace*.  The Supreme Court considered whether there was a reasonable probability the jury

would have found petitioner guilty of second degree assault, rather than first degree assault, had

a lesser included offense instruction been requested and given, and concluded, based on the

evidence presented at trial, that there was not.  This Court's review of the trial transcript

confirms that the Supreme Court's conclusion was a reasonable one.  Petitioner offered no

evidence at trial to directly counter the state's evidence that the shooter aimed at the second

vehicle and fired.  That the shot did not strike the vehicle directly, or cause any injury, is of no

moment.  It is unlikely, for the reasons cited by the Supreme Court, that the jury would have

found that petitioner lacked intent to inflict great bodily harm with respect to the second vehicle.

The Washington Supreme Court reasonably applied the *Strickland* standard in rejecting

petitioner's ineffective assistance of counsel claim.  Petitioner's federal habeas petition should

therefore be denied.

REPORT AND RECOMMENDATION
PAGE - 15

Certificate of Appealability

A petitioner seeking post-conviction relief under § 2254 may appeal a district court's dismissal of his federal habeas petition only after obtaining a certificate of appealability (COA) from a district or circuit judge.  A certificate of appealability may issue only where a petitioner has made "a substantial showing of the denial of a constitutional right."  See 28 U.S.C. § 2253(c)(3).  A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  Under this standard, this Court concludes that petitioner is not entitled to a certificate of appealability with respect to the claim asserted in his petition for writ of habeas corpus.

CONCLUSION

For the reasons set forth above, this Court recommends that petitioner's petition for writ of habeas corpus be denied and this action be dismissed with prejudice.  This Court further recommends that a certificate of appealability be denied.  A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit by no later than **November 8, 2018**.  Failure to file objections within the specified time may affect your right to appeal.  Objections should be noted for consideration on the District Judge's motion calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14)** days after service of objections.  If no timely objections are filed, the matter will be ready for consideration by the District Judge on **November 9, 2018.**

REPORT AND RECOMMENDATION
PAGE - 16

This Report and Recommendation is not an appealable order.  Thus, a notice of appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the assigned District Judge acts on this Report and Recommendation.

DATED this 18th day of October, 2018.

_James P. Donohue_

JAMES P. DONOHUE
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 17